IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH EDWARDS ROGERS, JR. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 14-319-GMS |
| ) | |
| NANCY BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant.[1] ) | |

## **MEMORANDUM**

## I.  **INTRODUCTION**

The plaintiff Joseph Edwards Rogers, Jr., ("Rogers"), who appears *pro se*, appeals the decision of Nancy Berryhill, Acting Commissioner of Social Security ("Commissioner"), denying his claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The parties have filed cross-motions for summary judgment.[2] (D.I. 21, 22.) The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[3]

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security, effective January 23, 2017, to succeed Acting Commissioner Carolyn W. Colvin, whose term ended on January 20, 2017. Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), Nancy A. Berryhill is automatically substituted as the defendant in this action.

[2] In his complaint, Rogers states that he suffered a stroke after he was denied benefits, but provided no documentation to support this statement. (*See* D.I. 1.) In addition, evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001).

[3] Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district

Rogers protectively applied for DIB on March 31, 2010, and for SSI benefits on May 8, 2012, alleging disability since September 1, 2009, due to a permanent back injury and arthritis.[4] (D.I. 16-2 at 21; D.I. 16-5 at 2-3; 16-6 at 53.) His claims were denied initially and upon reconsideration. (D.I. 16-3 at 2-6.) Thereafter, Rogers requested a hearing, which took place before an administrative law judge ("ALJ") on June 21, 2012. Counsel represented Rogers at the hearing, and Rogers and a vocational expert ("VE") testified. (D.I. 16-2 at 36-72.) The ALJ found that Rogers is unable to perform his past relevant work, but could perform simple, unskilled light work as identified by the VE. (*Id.* at 21-31.) Rogers sought review by the Appeals Council, but it denied his request for review and, therefore, the ALJ's decision became the final agency decision subject to judicial review. (*Id.* at 2-5.) On March 10, 2014, Rogers, now proceeding *pro se*, filed the current action for review of the final decision. (D.I. 1.)

## II. BACKGROUND

### A. Prior Decision

Rogers previously applied for DIB benefits. He received a partially favorable decision by an ALJ on August 31, 2009, when he was awarded benefits for the closed period of June 13, 2005 through September 19, 2007, after the ALJ found Rogers was unable to perform even

---

in which the plaintiff resides. . . ." 42 U.S.C. § 405(g).

[4]The relevant period for Rogers' DIB claim runs from September 1, 2009, the amended alleged onset date, to March 31, 2012, the date Rogers was last insured. (D.I. 16-6 at 2.); *see* 20 C.F.R. § 404.131(a) (2016) (to establish a period of disability, the claimant, who must have disability insured status, bears the burden to prove that the impairment became disabling prior to the date the insurance status expired). The relevant period for Rogers' SSI claim is May 8, 2012, the protective SSI application date, to July 12, 2012, the date of the ALJ's decision. (D.I. 16-2 at 21-30); *see* 20 C.F.R. §§ 416.335, .501 (SSI benefits are only payable as of the month after the month in which the application is filed); 20 C.F.R. § 416.330 (a claimant must establish that he became disabled and met the other requirements for benefits by the date of the ALJ's decision).

2

sedentary work due to a work related back injury that required surgery in May 2006 and a period for recovery and therapy. (D.I. 16-3 at 7-22.) Rogers sought review by the Appeals Council, but it denied his request for review and, therefore, the ALJ's decision became the final agency decision subject to judicial review. (*Id.* at 23-25.) There is no evidence that Rogers sought judicial review of the 2009 decision. Rogers states, "whether [he] followed proper court procedure or not does not change the significance of the injury." (D.I. 24.)

Claim preclusion, also known as *res judicata*, bars a claim litigated between the same parties or their privies in earlier litigation where the claim arises from the same set of facts as a claim adjudicated on the merits in the earlier litigation. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d. 247, 277 (3d Cir. 2014). Claim preclusion applies to Roger's disability status as of the date of the prior ALJ decision (*i.e.*, August 31, 2009). *See* 20 C.F.R. § 404.955 (2016) ("The decision of the administrative law judge is binding on all parties to the hearing . . . ."); 20 C.F.R. § 404.957(c)(1) (explaining that *res judicata* applies where facts and issues were already adjudicated in a final decision on a prior application). Accordingly, to the extent that Rogers contends that his disability continued after September 19, 2007 through the alleged onset date in this case (*i.e.*, September 1, 2009), the claim is barred.

### B. Plaintiff's Testimony

Rogers was represented by counsel and testified at the hearing. At the time of the hearing, Rogers was 51 years old, and married. (D.I. 16-2 at 43.) He testified that he has a high school diploma, a driver's license, and that drove himself to the hearing. (*Id.* at 44.) He provided descriptions regarding his past work from 1985 to the date of the hearing. (*Id.* at 44-47.) Rogers testified that in June 2012 he was hired to perform light duty work, one or two days

3

per week. (*Id.* at 48-49.) He further testified that he was actively looking for work that he could do with his restrictions, but was unable to find anything. (*Id.* at 49-50.) Rogers testified that he could care for his personal hygiene, prepare light meals, perform light housework (dusting, sweeping, loading the dishwasher, and laundry), run errands, and go grocery shopping. (*Id.* at 60-63.)

When questioned about his back condition, Rogers testified that he received injections in 2005, 2006, 2007 and 2010, but has not had any injections since November 2010 because they are not working for him. (*Id.* at 51.) Rogers received massage therapy in 2011, and it helped, but he no longer receives this type of therapy. (*Id.*) He now undergoes pain management. (*Id.*) Rogers takes medication for his back, but not every day. (*Id.* at 52.) The medication upsets his stomach, causes drowsiness, and makes him "a little slow on decisions." (*Id.*) Rogers testified that he has chronic pain in his back every day. (*Id.* at 52-53.) He also has a lot of tightness with spasms. (*Id.* at 53.) With medication, the pain is reduced to five on a scale of one to ten, and without medication it is a seven. (*Id.*) Treatment provides some relief. (*Id.*) At home, Rogers uses hot baths, a heating pad, a TENS unit, every afternoon he lies down with his feet up, and he does stretches to relieve the pain. (*Id.* at 57-58.) Rogers sees Dr. DuShuttle for his back condition. (*Id.* at 51.) In May, 2012, Rogers was referred to another physician for a second opinion for another back surgery, but he does not wish to undergo the surgery. (*Id.*)

Rogers also receives treatment for a mental condition. (*Id.* at 53.) He does not take any medications for the condition, but in the past has taken medication for anxiety. (*Id.* at 54.) Rogers explained that he is trying not to rely on medication. (*Id.*) Rogers testified that due to his back condition, he has lost confidence and becomes easily frustrated. (*Id.*) Rogers has difficulty

4

sleeping and takes natural medications to help with sleeping. (*Id.* at 55.) He suffers from headaches which occur every other day, or due to lack of sleep, and last a couple of hours. (*Id.* at 65.) He has problems with his memory, has no problems with mood swings, and is a little paranoid. (*Id.* at 56.) Lately, he has heard a few voices. (*Id.* at 57.) If he goes into a store, he has anxiety and leaves. (*Id.*)

Rogers testified that he can stand, sit, and walk less than one hour in an eight hour work day. (*Id.* at 58.) He has one flight of stairs in his home, but falls frequently when using them. (*Id.* at 58, 64.) He can lift ten pounds. (*Id.* at 58.) He has a hard time bending, a really hard time kneeling, no problem using his hands, and no problem breathing. (*Id.*) Reaching over his head and in front of him cause difficulty. (*Id.* at 65.) Rogers testified that his restrictions only allow him to work four hours a day performing sedentary work. (*Id.* at 64.)

### C. Plaintiff's Medical History, Condition, and Treatment

#### 1. Medical

Following a work-related accident, Rogers underwent a L4-5, L5-S1 discectomy due to disc herniation in May 2006. (D.I. 16-3 at 14.) He continued with pain management treatment provided by Ganesh Balu, M.D. ("Dr. Balu"), and saw Antonio Zarraga, M.D. ("Dr. Zarraga") from November 2008 through March 2010 with complaints of anxiety, depression, and lower back pain.[5] (D.I. 16-8 at 20, 27-65.)

On August 31, 2009, Dr. Zarraga reported Rogers' limited range of motion and an inability to bend the body due to back pain, positive straight leg raising, sciatic tenderness, and paraspinal pain with palpation. (D.I. 16-7 at 2.) He found Rogers had a poor prognosis and a

---

[5]*See* paragraph II.A., *supra*, discussing previous finding of limited disability.

5

permanent disability that could not be removed by treatment. (*Id.* at 3.) Dr. Zarraga reported functional limitations of: walking less than 100 feet; climbing one to two flights of stairs; lifting ten pounds or less; standing two hours or less; sitting two hours or less; and avoiding reaching above the shoulder level, stooping, bending, twisting, and temperature/humidity changes. (*Id.*)

In April 2010, Rogers presented to R.P. DuShuttle, M.D. ("Dr. DuShuttle"), who had last evaluated Rogers in 2007,[6] for reevaluation of his back. (D.I. 16-9 at 19.) X-rays of the thoracic spine indicated mild arthritis. (*Id.*) Upon examination, Rogers had full flexion and extension with stiffness, no sciatic notch tenderness/buttock pain/radiculopathy, straight leg raising test was negative bilaterally, mild tightness, guarding, and splinting in the thoracic area, and reflexes were symmetrical. (*Id.*) In July 2010, Dr. DuShuttle noted that Rogers reported an increase in back pain following yard work. (D.I. 16-9 at 18.) Examination revealed full flexion and extension with stiffness and bilateral sciatic notch tenderness with no buttock pain or radiculopathy, straight leg raising test was negative bilaterally, there was positive tightness, guarding, and splinting, positive spasm, no neuro or sensory deficits, and symmetrical reflexes. (*Id.*) When Rogers was seen by Dr. DuShuttle a few weeks later, they reviewed a July 16, 2010 lumbar MRI that revealed moderately severe bilateral neural foraminal narrowing at L5-S1. (D.I. 16-9 at 27.) Upon examination, Rogers had decreased flexion and extension, bilateral sciatic notch tenderness, positive tightness/guarding/splinting with no buttock pain or radiculopathy, straight leg raising tests were negative bilaterally, reflexes were symmetrical, and there were no neurological or sensory deficits. (*Id.*)

---

[6]In an August 23, 2007 report, Dr. DuShuttle classified Rogers' work restrictions as permanent sedentary light work, fours hours per day. (D.I. 16-8 at 226.)

6

Rogers received treatment at Compassionate Pain Management beginning in September 2010. (D.I. 16-12 at 2-45.) Nerve conduction velocity and electromyogram studies of the right arm and leg, conducted on November 19, 2010, were normal. (*Id.* at 26-33.) In a December 10, 2010 pain questionnaire, Rogers indicated that his pain with medication was six to seven. (*Id.* at 24.)

Rogers was seen by consultative examiner Joseph Schanno, M.D. ("Dr. Schanno") on November 16, 2010. (D.I. 16-9 at 28.) Rogers described persistent pain in the right hip and back, radiating down his legs to just above the knee, more common in the right leg, but occasional discomfort in the left leg. (*Id.* at 29.) Dr. Schanno observed that Rogers had a brisk gait and walked with no obvious limp, his mental status examination was relatively normal, neurological examination was within normal limits, cervical spine examination was normal, shoulders and hips had full/normal range of motion, and there was no paravertebral muscle spasm. (*Id.* at 30-31.) Dr. Schanno opined that Rogers could easily perform at a sedentary level of activity or even light duty if so motivated. (*Id.* at 32.) On December 1, 2010, and June 16, 2011, State agency reviewing physicians, Gurcharan Singh, M.D. ("Dr. Singh") and Joseph Michel, M.D. ("Dr. Michel") opined that Plaintiff could perform a limited range of unskilled light work. (D.I. 16-9 at 40-46, D.I. 16-10 at 26.)

In March 2011, Rogers was examined by Dr. Zarraga who noted an unremarkable neurological examination with limited motion in the lumbar and lumbosacral spine, and referred Rogers to pain management. (D.I. 16-10 at 13-14.) Rogers continued with pain management through January 2012. (D.I. 16-12 at 2-45, 57-76.) He continued to be seen by Dr. Zarraga,

including visits on August 2, 2011, September 22, 2011, May 4, 2012, and May 31, 2012. (D.I. 16-13 at 38-45.)

A May 11, 2011 thoracic spine MRI revealed no disc herniation, stenosis, alteration of the central canal or foramina, or cord compression. (D.I. 16-12 at 48, 77.) An MRI of the lumbar spine taken the same day, showed the previous right-sided L5-S1 hemilaminectomy, mild epidural fibrosis in the right lateral recess, contact of the right S1 nerve root, a disc extrusion at L4-5 extending superiorly from the disc space level, and moderate stenosis. (*Id.* at 46-47, 78-79.)

Rogers returned to Dr. DuShuttle, on May 8, 2012, having last seen him on July 27, 2010. (D.I. 16-13 at 3.) On that day, Dr. DuShuttle, classified Rogers' work restrictions as permanent sedentary light work, fours hours per day. (D.I. 16-12 at 87.) Dr. DuShuttle observed sciatic notch tenderness, buttock pain to palpation, tightness, guarding, and splinting, but reflexes were full and symmetrical, there was no objective sensory deficit, straight leg raise was negative, and there was a five to ten degree loss of flexion. (D.I. 16-13 at 3.) On May 17, 2012, Dr. DuShuttle completed a lumbar spine residual functional capacity questionnaire. (D.I. 16-12 at 82-86.) He reported diagnoses of lumbar stenosis, lumbar degenerative disc disease, and lower extremity radiculopathy supported by MRI findings and noted a fair prognosis. (*Id.* at 82.) Dr. DuShuttle reported Rogers' complaints of pain and his findings of a five to ten degree reduced range of motion, muscle spasm, muscle weakness, tenderness, and crepitus. (*Id.* at 82-83.) Dr. DuShuttle stated that Rogers can walk two city blocks without rest or severe pain, can sit for more than two hours and can stand for one hour before needing a break in an eight-hour workday and, with normal breaks, can stand/walk less than two hours and sit at least six hours. (*Id.* at 83-84.) He also determined that Rogers needs to walk every sixty minutes for ten minutes each time and will

need to take unscheduled breaks during an eight-hour work day. (*Id.*) Dr. DuShuttle determined that Rogers can occasionally lift less than ten pounds, rarely lift and carry 10 pounds, never twist, crouch/squat, or climb ladders, and rarely stoop and climb stairs. (*Id.* at 85.) A May 22, 2012 lumbar spine MRI was unchanged when compared to the previous July 2010 MRI, showed no evidence of central canal stenosis or disc herniation, and showed the previous right-sided lumbar laminectomy at L4-L5 and L5-S1. (D.I. 16-13 at 55-52.)

### 2. Mental Health

Rogers received therapy from Sheryl Winsby, Ph.D. ("Dr. Winsby"), from April 5, 2010 through April 12, 2011 to discuss issues concerning pain, finances, and his circumstances due to his back.[7] (D.I. 16-9 at 20-26; D.I. 16-13 at 31-37.) At the April 13, 2010 session, Rogers indicated that he was no longer depressed. (*Id.* at 25.)

Rogers underwent a consultative psychological evaluation by Joseph Keyes, Ph.D. ("Dr. Keyes") on December 7, 2010. (*Id.* at 33-38.) Dr. Keyes concluded that Rogers' orientation, mental alertness, and memory were within normal limits, with a mild disturbance in concentration. (*Id.* at 35-36.) Rogers' affect was appropriate to the situational context and adequately modulated, he interacted and conversed easily and appropriately, and his social and interpersonal skills were appropriate and adequate. (*Id.* at 36.) Rogers exhibited an adjustment disorder with depressed mood related to his back problem and loss of employment. (*Id.*) He

---

[7]A May 2007 vocational-psychological evaluation found mild to moderate range of depression, problems with decision making and indecisiveness, a mild degree of low mood, feelings of pessimism, sense of failure, dissatisfaction with life, and several vegetative symptoms of depression. (D.I. 16-8 at 19.) The evaluation recommended occupational areas that are largely semiskilled, noting that Rogers' physical imitations would play a significant role in developing a meaningful vocational plan. (*Id.*)

noted that Rogers was capable of performing self-care skills, light activities of daily living, independent in self-care, and performed light household domestic chores and tasks. (*Id.*) Dr. Keyes assessed a GAF score of 65.[8] (*Id.*)

On December 16, 2010, and June 6, 2011, State agency reviewing psychologists, Jennifer Hill-Keyes, Ph.D. ("Dr. Hill-Keyes") and Carlene Tucker-Okine, Ph.D. ("Dr. Tucker-Okine") conducted psychiatric review techniques and opined that Rogers had medically determinable impairments that were not severe. (D.I. 16-10 at 2-12, 15-25.)

### D. VE Testimony

During the hearing before the ALJ, the VE classified Rogers' prior relevant work (electronic assembler, heavy equipment operator, loader, security guard, electronic assembler) as either unskilled exertional level medium, semi-skilled exertional level medium, or semi-skilled exertional level light. (D.I. 16-2 at 66-68.) The VE testified that a person who had performed those occupations would have skills that would transfer into jobs with less demanding skills, such as amusement equipment operator, and coordinator for measuring equipment operator. (*Id.* at 68.)

The ALJ then asked the VE to consider the following hypothetical question:

---

[8]The Global Assessment of Functioning scale considers the psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. text revision 2000). The GAF scale was not included in the DSM-V, for several reasons, including its conceptual lack of clarity. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. *See* DSM-IV-TR at 34.

> [t]his is an individual who is approximately the claimant's stated age, an onset of about 49 years, has a high school degree, is able to read and write and do at least simple math, adding and subtracting, certain underlying impairments [] placed limitations on the ability to do work related activities . . . with a light level of exertion and this hypothetical with all the posturals are occasional, but there is . . . no climbing a ladder, a rope or a [scaffold]. And with this light level of exertion would there be any of the claimant's past work such a person could do?

(*Id.* at 69.) The VE responded, "It would be the security guard and electronic assembler, . . . [exertion level] light." (*Id.*) The ALJ changed the hypothetical to include a sit/stand option and the VE testified that neither of the jobs could accommodate that limitation. (*Id.*) Next, the ALJ asked if there were "any simple unskilled work this person could do at the light level of exertion . . . and at sedentary . . . ." (*Id.*) The VE responded the positions that could be performed were: housekeeping cleaner, exertional level light and unskilled; addressor, exertional level sedentary and unskilled; bagger, exertional level light and unskilled; and amusement equipment operator, exertional level light and semi-skilled. (*Id.* at 70.)

### C. Regulatory Framework and the ALJ's Findings

Within the meaning of social security law, a "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. §§ 404.1505, 416.905. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for

11

disability insurance benefits, the claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520; 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the ALJ considers whether the claimant is currently engaged in substantial gainful activity, and if not proceeds to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.910(a)(4); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). At step two, the ALJ considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.910(a)(4)(ii). If the claimant suffers a severe impairment, the ALJ considers at step three whether the impairment meets the criteria in the listing of impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (1999).[9] *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.910(a)(4)(iii). If the impairment does not meet the criteria for a listed impairment,[10] then the ALJ considers at step four whether, despite

---

[9]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii), 416.920(a)(4)(ii)(iii).

[10]At steps two and three, limitations in four functional areas are used to determine the severity of a claimant's mental impairment. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). These areas, sometimes referred to as the Paragraph B criteria, include activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition. 20 C.F.R.

the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work.[11] *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.910(a)(4)(iv); *Sykes*, 228 F.3d at 263. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. *Id.* At this last step the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC.]" *Id.*

The ALJ determined that: (1) Rogers had not engaged in substantial gainful activity since September 1, 2009; (2) Rogers had severe impairments of degenerative disc disease and an adjustment disorder with depressed mood; (3) all other impairments were non-severe; and (4) that Rogers did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (D.I. 16-2 at 23-24.) The ALJ found that Rogers had the RFC to perform light work[12] as defined in 20 C.F.R. 404.1567(b) and 416.967(b),

---

404, Subpt. P, App. 1, at § 12.00.

[11]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

[12]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do

except that he can never climb ladders, ropes, or scaffolding, and can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, and is limited to simple, unskilled work. (*Id.* at 25.) The ALJ determined that Rogers is unable to perform any past relevant work, that he was defined as a younger individual on the alleged disability onset date and subsequently changed age category to closely approaching advanced age. (*Id.* at 30.) Based upon the VE's testimony, the ALJ concluded that considering Roger's age, education, work experience, and RFC, he is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and therefore, Rogers was not disabled from September 1, 2009 through the date of the July 12, 2012 decision. (*Id.* at 31.)

## III. STANDARDS OF REVIEW

### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the court determines that there is no genuine issue as to any material fact and that the movant is

---

substantially all of these activities. If some can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). The Social Security Regulations define sedentary work as follows: "Sedentary-work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

14

entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ .P. 56(c)).

### B. Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Secretary of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

Rogers objects to the Commissioner's determination on the following grounds: (1) the ALJ afforded improper weight to Dr. Schanno's opinion; and (2) the ALJ's decision is not

15

supported by substantial evidence. The Commissioner seeks summary judgment on the grounds that substantial evidence supports the RFC assessment.

Rogers' position is that the ALJ improperly relied upon the report of examining consultant Dr. Schanno. Rogers argues that Dr. Schanno "did not spend 10 minutes to check or see [his] back and hip injury, felt like [he] was wasting his time, [was] very rude, could not hear what was told to him, [and] the evaluation was not professional." (D.I. 24.) The ALJ gave great weight to Dr. Schanno's opinion that Rogers could perform sedentary or light duty activity finding that it was consistent with the credible evidence of record. (D.I. 16-2 at 29.) In addition, the ALJ gave great weight to the assessments of State agency consultants. (*Id.* at 29-30.) The ALJ gave little credit to the opinions of treating physicians Dr. DuShuttle and Dr. Zarraga, one of whom opined that Rogers perform sedentary light duty work for four hours per day. (*Id.* at 29.)

An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight only when they are well-supported and not inconsistent with other substantial evidence in the record.[13] *See Hall v. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. Feb. 2007) (unpublished) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes . . . as well as

---

[13]The Social Security Administration recently abolished the treating source rule. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01 at 5853 (Jan. 18, 2017, effective Mar. 27, 2017) ("we are not retaining the treating source rule").

other contradictory medical evidence"); *Fargnoli*, 247 F.3d at 43. In addition, it is well established that a non-examining physician's opinions "have less probative force as a general matter, than they would have had if the doctor had treated or examined [the claimant]." *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 416.927(d)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."). The ALJ's decision to give great weight to the examining and nonexamining consultants was both thoroughly explained and well supported by substantial evidence.

The ALJ gave little credit to the opinions of Rogers' treating physicians, noting their opinions were inconsistent with the credible evidence of record, the longitudinal medical evidence, reported activities, and Rogers' pain medication usage. (*Id.*) In reviewing the ALJ's decision, the court finds that the ALJ fully considered the opinions of Dr. DuShuttle and Dr. Zarraga, and adequately explained why they were entitled to little weight, considered the evidence of record, and provided ample reasons to support her decisions in the assignment of weight to the medical opinions of record. The Court finds no error in her decision.

In addition, Rogers argues that the ALJ's decision is not supported by substantial evidence, while the Commissioner contends that substantial evidence supports the RFC assessment as determined by the ALJ. The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. Nov. 2012) (unpublished) (citing 20 C.F.R §§ 404.1546(c)).

Here, the ALJ considered the effects of Rogers' condition in relation to his ability to perform work. It is clear in reading the ALJ's decision that she thoroughly reviewed Rogers' longitudinal treatment history. The ALJ noted that in April 2010, Rogers was seen by Dr. Shuttle and examination indicated that Rogers had full flexion and extension with stiffness, no sciatic notch tenderness/buttock pain/radiculopathy; straight leg raising test was negative bilaterally, he had only mild tightness, guarding, and splinting in the thoracic area, and reflexes were symmetrical. Also, thoracic spine x-rays showed only mild arthritis. In July 2010, examination revealed decreased stiff flexion and extension with stiffness, bilateral sciatic notch tenderness with no buttock pain or radiculopathy, straight leg raising test was negative bilaterally, positive tightness, guarding, and splinting and positive spasm but no neuro or sensory deficits and reflexes were symmetrical. MRIs taken in 2010 revealed moderately severe bilateral neural foraminal narrowing at L5-S1.

The ALJ considered Rogers' March 2011 visit with Dr. Zarraga, wherein he noted an unremarkable neurological examination and that Rogers had limited motion in the lumbar and lumbosacral spine. A thoracic spine MRI revealed no disc herniation, stenosis, alteration of the central canal or foramina, or cord compression and a lumbar spine MRI showed the previous right-sided L5-S1 hemilaminectomy as well as disc protrusion with moderate stenosis at L4-5.

When Rogers was seen in May 2012, examination revealed sciatic notch tenderness, buttock pain to palpation, tightness, guarding, and splinting, but reflexes were full and symmetrical, there was no objective sensory deficit, straight leg raise was negative, and Rogers had only 5-10 degree loss of flexion and an MRI taken the same month of the lumbar spine MRI showed no evidence of central canal stenosis or disc herniation.

The ALJ also considered statements regarding Rogers' activities interspersed throughout the medical records including that Rogers reported doing landscape work, working in the garden, fishing, and doing mechanical work compared to Rogers' testimony that he suffered from continued pain and because of this he is unable to work. (D.I. 16-2 at 28.) The ALJ considered the medical records wherein Rogers was referred to pain management and his testimony that he had been prescribed daily medication for his pain, but does not take it because he does not like the side effects. In addition, Rogers reported some improvement with treatment.

The ALJ also considered Rogers' testimony that in June 2012 he was hired at a job to perform light duty work, one or two days per week and that he was actively looking for work that he could do with his restrictions, but was unable to find anything. *See* 20 C.F.R. § 404.1571 (discussing work performed after the alleged onset date, "[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more than you actually did"); *see also Russo v. Astrue*, 421 F. App'x 184, 189 (3d Cir. 2011) (unpublished) (finding it notable that the plaintiff continued working after alleged onset date even though that work did not reach the level of substantial gainful activity). Finally, the ALJ considered Rogers' testimony regarding his ability to care for himself, perform light housework, run errands, and go grocery shopping. In considering the foregoing, the ALJ found that Rogers' statements concerning the intensity, persistence and limiting effect of his symptoms not credible to the extent they are inconsistent with the RFC assessment. (D.I. 16-2 at 26.)

In addition, in assessing Rogers' physical RFC, the ALJ afforded great weight to the examining medical consultant and non-examining State agency medical and psychological consultants who found Rogers capable of work at a sedentary or light duty activity that is simple

and unskilled, but no climbing of a ladder, rope, or scaffold, and occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. The ALJ did not elevate her own medical opinion over those of the physicians, but rather made findings based upon all of the evidence in the record.

The substantial evidence of record supports the ALJ's finding that Rogers cannot perform his past relevant work and the RFC assessment that Rogers can perform a limited range of light work. The ALJ thoroughly analyzed the medical evidence, considered the medical opinions, and appropriately relied upon the testimony of the VE. Accordingly, the court finds that substantial evidence supports the ALJ's ruling and her evaluation of Rogers' RFC.

## V. CONCLUSION

For the reasons discussed above, the court finds that substantial evidence supports the findings of the ALJ. Therefore, the court will: (1) deny Rogers' motion for summary judgment (D.I. 21); and (2) grant the Commissioner's cross-motion for summary judgment (D.I. 22).

An appropriate order will be entered.

                                                  UNITED STATES DISTRICT JUDGE

June 19, 2017
Wilmington, Delaware